OTTO J. SELLE v. CHARLES SELLE, ANNIE DEITZSCHOLD, IDA ELLRICK, LILLIE ELLRICK, HERBERT ELLRICK, FRANK ELLRICK, ALLEN ELLRICK, NELLIE BEEBE and HERMAN DEITZSCHOLD, Administrator of the Estate of JOHN SELLE, Appellants.—88 S. W. (2d) 877.

Division One, December 18, 1935.

*Robison & Robison* and *Denton Dunn* for appellants.

*Pross T. Cross, Gerald Cross* and *R. H. Musser* for respondent.

BRADLEY, C.—This is an action for specific performance of an alleged verbal contract between plaintiff and John Selle, deceased, by which contract, it is alleged that deceased agreed to give eighty acres of land in Clinton County, Missouri, to plaintiff, if plaintiff would take care of John Selle for the remainder of his (John Selle's) life. The chancellor granted the relief sought and defendants appealed.

It is alleged in plaintiff's petition that John Selle died intestate in Clinton County, Missouri, September 5, 1932; that he was never married; that he left surviving, no direct descendants; that his sole heirs at law were plaintiff, a nephew, defendants, Charles Selle and Annie Deitzschold, a brother and sister; defendants, Ida, Lillie, Herbert, Frank and Allen Ellrick, nephews and nieces, and Nellie Beebe, a niece; that defendant, Herman Dietzschold, was the administrator of the estate of John Selle, deceased; that at the time of his death, deceased owned the eighty acres of land, describing it, which is the land in question. It is further alleged that on the —— day of August, 1932, plaintiff and deceased entered into a verbal contract whereby the deceased "then and there promised and agreed with plaintiff that if he, plaintiff, would take him (the said John Selle) into his (plaintiff's) home and there keep him, provide for him, board him, nurse him and care for him and give him a home as long as he (the said John Selle) should live, that then plaintiff, upon the death of the said John Selle, should have and was to have and the said John Selle would give and leave to him, absolutely and in fee simple" the land described. It is alleged that plaintiff performed the alleged agreement and that deceased left sufficient personal estate to pay all debts and funeral bills, and that all such were paid. Plaintiff prayed judgment to the effect that the court find and adjudge that the contract was made as alleged; that plaintiff had fully performed and that it be adjudged and decreed that he, plaintiff, was the owner in fee of the land described.

Defendants answered, admitting that deceased, at the time of his death, owned the land described; that he died September 5, 1932; that his sole heirs were as alleged; that defendant, Herman Deitzschold, was the duly appointed administrator; and that deceased left sufficient personal property to pay all claims against the estate. Other allegations in the petition were denied generally. Defendants, further answering, alleged that the contract claimed by plaintiff was not in writing and invoked the Statute of Frauds; alleged that if plaintiff ever rendered any services to the deceased that he, plaintiff, had received full pay therefor prior to the death of deceased; that if plaintiff rendered any service to deceased after the alleged contract that such "services covered a very short period of time, to-wit, not exceeding 12 days, and the value, if any, of said services can easily be determined in dollars and cents, and adequate relief given at law;" that it would be unconscionable to enforce said alleged contract; that at the time of the death of deceased, plaintiff owed deceased an amount in excess of the value of the services rendered after the date of the alleged contract; that said sum so owed by plaintiff was for obligations of plaintiff which deceased as surety had paid for plaintiff.

Defendants in a separate count set out the interest, from their viewpoint, of plaintiff and defendants in the land described, and asked for partition. Plaintiff replied by denying generally the new matter.

The chief contention is that under the facts plaintiff was not entitled to specific performance. The deceased, John Selle, was seventy-one years old at the time of his death and for many years lived alone on the farm in question. Plaintiff and his family had for twenty years lived on a farm owned by deceased until a short time prior to his death, and plaintiff and his family were still on this farm at the time of the death of deceased. It was about a half mile "across the woods" from plaintiff's home to the home of deceased. August 24, 1932, plaintiff and other members of his family, having learned that deceased was sick, went to see about him, and it is claimed that the alleged contract was made on that day at the home of deceased. On that day deceased was moved to plaintiff's home where he was taken care of by plaintiff and his family, and other relatives and friends, until his death on September 5th.

Plaintiff's evidence was substantially as follows: Minnie Selle, wife of plaintiff, testified that during the twenty years she and her husband had lived on the farm of deceased that he had lived alone; did his own housekeeping and cooking, except for the last two years, she had helped him to some extent, had taken "things to him;" that she had done this off and on, but more "the last two winters." As to the alleged contract, Mrs. Selle testified that deceased, at his home and just prior to being moved to plaintiff's home, said to plaintiff:

"Otto, I am sick; I have to be taken care of and I am not able and I want you to take me in your home and give me a home as long as I live; then you shall have this eighty acres;" and that plaintiff said in reply: "I will take you in my home and give you a home as long as you live;" and that in "an hour or so" afterwards, deceased was taken to plaintiff's home and was taken care of until his death. Other relatives and some neighbors, not related, assisted some in sitting up with and waiting on deceased. No point is made on the care and attention given deceased by plaintiff, hence it is not necessary to go into detail about the attention and care.

Frank Peters, a cousin of plaintiff's wife, was present at the time of the making of the alleged contract, and testified: "Well, I came in the house and Mr. John Selle says to Otto, he says, 'Otto,' he says, 'I am sick.' And he says, 'I am where I can't take care of myself any longer.' And he says, 'Will you take me to your home and take care of me.' He says, 'There is no one takes care of me, but Otto and Min.' And he says, 'Will you take care of me as long as I live?' Otto says, 'Yes, sir, I will.' and Mr. John Selle says, 'If you will take care of me as long as I live, you shall have this eighty acres of land.' "

Edward Selle, plaintiff's son, testified: "Well, he (deceased) said he was awful sick and that he wanted Otto to take him home with him and give him a home, nurse him and take care of him as long as he lived; that if he would, why, he said he could have that eighty acres of land," and that plaintiff said: "All right, Uncle John, I will; I will take you over there today and give you a home the rest of your life." Mrs. Edward Selle, who was present at the home of deceased at the time of the making of the alleged contract, testified: "Well, when he (deceased) looked up and saw Mr. Selle come in, he said, 'Otto, my boy, I am very sick.' And he said that he didn't have anyone to care for him but Mr. and Mrs. Selle, and he wanted Mr. Selle to take him into his home and care for him as long as he lived, and he told Mr. Selle if he would take him into his home and care for him as long as he lived, he said, 'I shall give you this 80 acres when I die,' and that plaintiff said, 'I will, Uncle John.' He told him he would take him into his home, care for him and do the best he could for him as long as he lived." On cross-examination, Mrs. Edward Selle testified: "He (deceased) told Mr. Selle (plaintiff) he said that they all seemed like they were ashamed of him; he didn't mention any names, and he said, 'You and Min are the only ones I can depend on.' And he wanted them—he asked Mr. Selle if he wouldn't take him into his home. Mrs. Selle wanted him to—well, she told him he should have the care, and that if he could not come there, he should go to the hospital, and he didn't want to go to the hospital."

The evidence for defendants was, so far as pertinent here, as fol-

lows: Defendant, administrator, Herman Deitzschold, husband of defendant Annie Deitzschold, and brother-in-law of deceased, testified that he went three or four times to see deceased during his last illness; that his wife went; that deceased had a box "under the bed" at plaintiff's home; that after the funeral, plaintiff had the key to this box; that he, witness, and other relatives looked in this box "to see whether there was a will there; that no will was found; that after he was appointed administrator he had a conversation with plaintiff and said to him: "Now, Otto, I want you to put in a reasonable bill, and I will pay it, for taking care of Uncle John. And he (plaintiff) said, 'All right, I will.' " That afterwards, he saw plaintiff in town and said to him: "Why don't you put in that claim of yours? I want to pay it; I am responsible for this money, and if the bank goes broke I am the loser, and I want to get rid of it,' I says, 'Why don't you put in the claim?' 'Well,' he said, 'I will tell you, I want to look around a little more. I want to kind of inquire around what the people think it is worth.' He says, 'One man told me it was worth $450.00, but,' he says, 'that is out of reason; that is too much.' Q. What did you say? A. I says, 'Now, I will tell you, it may be I can help you out a little there; 12 days there taking care of him for 12 days, I think $100.00 would be about reasonable, that would be twice as much as it would cost at the hospital.' And he flew right up in the air, and he said, no, that was nothing. I said, 'If it is not enough, put in your claim and I will pay it if it is reasonable.' " Herman Deitzschold further testified that in April, 1932, he saw plaintiff sign and deliver a note for $250 to deceased and that he, witness, was not able to find this note; that he asked plaintiff about this note and that plaintiff replied that "Uncle John said he was going to destroy it;" that nothing was said about whether plaintiff had or had not paid the note.

Dr. Vancil James testified that, shortly after the death of deceased, he had a conversation at his office with plaintiff and that in this conversation plaintiff asked him what he thought it would be worth to take care of deceased as he had, and that he told plaintiff, "I don't think $100 would be out of the way;" that plaintiff said nothing about "a contract to get 80 acres of land in payment." Plaintiff also made inquiry of Dr. J. E. Bowman who treated deceased in his last illness as to what Dr. Bowman thought would be a fair charge for taking care of deceased. Noah Long testified that in a conversation with plaintiff "right after the death" of deceased, plaintiff told him about moving deceased to his (plaintiff's) home; and said that deceased did not want to move; that "they just had to load him up and bring him over." Fred Deitzschold, son of Herman and Annie, and cousin of plaintiff, testified that he lived near plaintiff; that he was at plaintiff's home during the last illness of deceased, except the two days before he knew his uncle was sick; that

he assisted in taking care of deceased; "stayed there at nights;" that after the death of deceased he had a talk with plaintiff about opening the box containing the papers of deceased and above mentioned, and that in the conversation, plaintiff did not say anything "about having an oral agreement to have this 80 acres for taking care" of deceased. Defendant, Allen Ellrick, a half-brother of plaintiff, testified in effect as did Fred Deitzschold.

. We revert to the evidence of Herman Deitzschold, the administrator of the estate and brother-in-law of deceased. He had known deceased for fifty years, and said that the relations between his entire family and deceased were friendly; were always friendly; that he, witness, "would take him (deceased) home to dinner and my wife always sent a box of eats with him every time he came, and gave him blankets and bedding, and I gave him suits of clothes, and a good overcoat so he would have something to wear." The brother-in-law, Deitzschold, held a mortgage on the seventy-acre farm of deceased, which plaintiff had occupied for twenty years; and said that deceased owed $800 to a nephew in California, and that the nephew "wanted his money;" that deceased came to him, but Deitzschold was not permitted to tell what the deceased said. This was, as we understand the record, in the late Spring of 1932, prior to the death of deceased the following September. Deitzschold told deceased that the debt secured by the mortgage was due and that he, deceased, "ought to do something." Deitzschold did not foreclose, but found a buyer for the land and the nephew and Deitzschold were paid. All the witnesses, where the subject is mentioned in their evidence, say that the relation between deceased and his relatives were friendly, and there is nothing to the contrary, except what may be inferred from the remark of deceased that he did not have anyone to take care of him, except plaintiff and his wife. There was evidence tending to show that the land in question was worth around $2000 and that the reasonable value of the services rendered deceased by plaintiff, after the date of the alleged contract, was $100 to $150.

In an equity case we are not bound by the finding below on the facts, but we should and do give great weight to the finding by the chancellor. He had the witnesses before him and was better able to arrive at the true facts than are we. It was found that the contract was made as pleaded and we adopt that finding. In cases similar on the facts to the present case, each case has had to rest . on its own facts. In some instances the Statute of Frauds has been regarded as a bar while in others, the statute has not been permitted to defeat recovery. In Berg v. Moreau, 199 Mo. 416, 97 S. W. 901, 9 L. R. A. (N. S.) 157 (specific performance granted); Russell v. Sharp, 192 Mo. 270, l. c. 285, 91 S. W. 134, 111 Am. St. Rep. 496 (specific performance denied); Sutton v. Hayden, 62 Mo. 101, l. c. 112 (specific performance granted); Gupton v. Gupton, 47 Mo.

37 (specific performance granted with conditions); Hiatt v. Williams, 72 Mo. 214 (specific performance granted); Hall v. Harris, 145 Mo. 614, 1. c. 622, 47 S. W. 506 (specific performance granted); Rosenwald v. Middlebrook, 188 Mo. 58, 86 S. W. 200 (relief denied); Walker v. Bohannan, 243 Mo. 119, 147 S. W. 1024 (relief denied); Oliver v. Johnson, 238 Mo. 359, 142 S. W. 274 (relief denied); Ackerson v. Fly, 99 Mo. App. 116, 72 S. W. 706 (relief denied). The holding in other jurisdictions has been as varied as in our own. In 69 American Law Reports, 14 et seq., is a note of 205 pages on the subject of agreements to leave property to another, in which note, numerous rulings are collected. The general rule and our own rule is, under such contracts, that, although the contract is oral, if the contract has been fully performed by the party agreeing to render the service so that a denial of specific performance would work a fraud on the party who has fully performed, then the Statute of Frauds cannot be successfully invoked as a bar to recovery. [Berg v. Moreau, 199 Mo. 416, 1. c. 433, 97 S. W. 901.] But, in ruling such contracts, even though performed on one side, the subject of specific performance is always within the sound discretion of the chancellor, and such relief will be granted or denied, according to the facts. [Kirk v. Middlebrook, 201 Mo. 245, 1. c. 289, 100 S. W. 450; Forrister v. Sullivan, 231 Mo. 345, 1. c. 373, 132 S. W. 722.] And "it is only where the very justice of the thing is so clear, that the refusal of relief (specific performance) would itself amount to a deep seated wrong and fraud upon the party, that courts of equity will act," to enforce specific performance under such facts as here. [Walker v. Bohannan, 243 Mo. 119, 1. c. 137, cited, supra.] To obviate such frauds and injustice as would result from "the very justice of the thing," if the Statute of Frauds be followed in its letter in contracts such as here, courts of equity have generally recognized certain exceptions. But these exceptions are to be invoked with caution, so as not to result in the perpetration of frauds. To be entitled to specific performance of an oral contract such as the contract at bar, the case of Walker v. Bohannan, supra, lays down these requirements: "(1) The alleged oral contract must be clear, explicit and definite; (2) it must be proven as pleaded; (3) such contract cannot be established by conversations either too ancient on the one hand, or too loose or casual upon the other; (4) the alleged oral contract must itself be fair and not unconscionable; (5) the proof of the contract as pleaded must be such as to leave no reasonable doubt in the mind of the chancellor that the contract as alleged, was in fact made and that the full performance, so far as lies in the hands of the parties to perform, has been had; (6) the work constituting performance must be such as is referable solely to the contract sought to be enforced, and not such as might be reasonably referable to some other and different contract; (7) the con-

tract must be one based upon an adequate and legal consideration, so that its performance upon the one hand but not upon the other would bespeak an unconscionable advantage and wrong, demanding in good conscience relief in equity; and (8) proof of mere disposition to devise by will or convey by deed by way of gift, or as a reward for services, is not sufficient, but there must be shown a real contract to devise by will or convey by deed, made before the acts of performance relied upon were had.''

Cases have arisen in this and other jurisdictions on contracts like and similar to the one here, where to have denied specific performance would have resulted ''in a deep seated wrong.'' Such a case was Sutton v. Hayden, 62 Mo. 101, supra, and other cases there cited. In the Sutton case it appears the services were performed over a period of about fifteen years and were ''menial and in themselves arduous and disagreeable, such as the helpless and invalid condition of Mrs. Green rendered necessary; that all such services were performed . . . with tenderness and affection.'' The services rendered in the Sutton case are characterized as such that ''money cannot buy; a thousand nameless and delicate services and attentions, incapable of being the subject of explicit contract, which money with all its peculiar potency, is powerless to purchase.''

One obstacle in the path of plaintiff, seeking specific performance is that the service rendered by him can be easily compensated in money. In 25 Ruling Case Law, page 307, section 122, it is stated: ''Although the courts are not in harmony on the proposition as to whether or not the performance of services, or furnishing of support, under a contract to devise realty in consideration thereof, is sufficient part performance to satisfy the Statute of Frauds where no possession of real estate is taken under such contract, the weight of authority holds that, if the support to be furnished, or services to be rendered, are of such a character as to be capable of an approximately accurate estimate, and their value liquidated in money, so that the promisee may be made substantially whole, specific performance will not be decreed. But this limitation of the rule has no application where the consideration for the contract is that the promisee shall assume a peculiar and domestic relation to the promisor, and render to him services of such a peculiar character that it is practically impossible to estimate their value by any pecuniary standard.'' Forrister v. Sullivan, supra, was an action to enforce specific performance of a verbal contract to convey certain land before the death of the promisor, the consideration being for services rendered the promisor by the promisee. The relief sought was denied. In discussing the requirements as to such contracts, in order to successfully invoke the power of a court of equity for specific performance, it was ruled (231 Mo. 374) that ''the contract must be grounded on an adequate and legal consideration, and it

should be made clear to the mind of the chancellor that the law could not give adequate and perfect relief in damages, thereby attaining the full end and justice of the case and reaching the whole mischief.'' Another outstanding fact in the present case is the short duration of the service rendered by plaintiff. This feature cannot escape the attention of a court of conscience and it cannot fail to suggest the maxim that he who seeks equity must do equity, one of the oldest maxims of equity jurisprudence and applicable to all classes of equity cases when necessary to promote justice. [21 C. J. 174.] In addition to the short duration of service rendered in the present case, the record discloses that the services rendered by plaintiff were not arduous, nor can it be said that they were disagreeable. As stated, the deceased, John Selle, was taken to plaintiff's home August 24, 1932, and died there September 5th following. His condition, when taken to plaintiff's home, must not have been considered serious, because a doctor was not called until August 26th, and the trouble was diagnosed as cancer of the stomach. Dr. J. E. Bowman, who was called, said that the deceased had been to his office about a ''couple of days'' before he was called to see deceased at the home of plaintiff, and it appears that on the day deceased was moved, plaintiff's son, Edward, had gone to town, Cameron, to get medicine for deceased. So far as appears, Dr. Bowman was the only physician called and he made only the one visit. Before he made the visit on August 26th, Dr. Bowman said he knew what was affecting John Selle, but was not certain that he told him. So far as appears, none of the relatives of deceased knew that he was suffering from cancer, until August 26th. Dr. Bowman said that he thought he told plaintiff on August 26th. He also said that plaintiff asked him how long he thought deceased would live and that he told plaintiff that he ''didn't think he would live two weeks.'' We do not mean to imply by here again referring to the evidence that plaintiff was remiss in caring for deceased. It appears from plaintiff's evidence that deceased did not desire to go to a hospital and no claim is made that deceased was not properly looked after. That the value of the services rendered by plaintiff was small in comparison with the remuneration, if specific performance is granted, will be conceded.

Contracts similar to the present one have been enforced in some jurisdictions, although the time of service was for a short, or comparatively short duration. [See Howe v. Watson, 179 Mass. 30, 60 N. E. 415; Woods v. Dunn, 81 Ore. 457, 159 Pac. 1158; Lothrop v. Marble, 12 S. D. 511, 81 N. W. 885, 76 Am. St. Rep. 626; Bryson v. McShane, 48 W. Va. 126, 35 S. E. 848, 49 L. R. A. 527; Watson v. Mahan, 20 Ind. 223; Dingler v. Ritzius, 42 Idaho, 614, 247 Pac. 10.] However, in some of these cases it is pointed out that no point was made on the inadequacy of the consideration, which is not the

case here. Also, in the present case the promisor, John Selle, was ill when the contract was made and "was very much emaciated," which plaintiff knew, at least it is fair to so infer, and we do not think that what is said by plaintiff on the subject of life expectancy and the contract being fair when made can be invoked here. More is required to justify specific performance in cases like the one here than life expectancy and that the contract was fair when made. Other subjects of equal importance enter into such contracts. In Berg v. Moreau, 199 Mo. 416, l. c. 425, 97 S. W. 901, the promisor, Moreau, was seventy-nine years old and lived practically alone; was somewhat feeble, but led an active life. His only child was a son who was in independent circumstances and "somewhat estranged" from the father. Moreau owned a small homestead of 5.3 acres, worth from $1000 to $1500, a farm worth $10,000 and notes in the sum of $2000, a horse and buggy and household effects, worth together, $135. He needed assistance and secured the services of Mrs. Berg, who, with her husband, moved to the Moreau home and looked after him for a period from February 6, 1901, to February 14, 1902, on which last-mentioned date, Moreau died. Moreau agreed with Mrs. Berg that if she would come to his home and look after him he would, at his death, convey to her or make a will and give her the homestead place, the horse and buggy and some other personal property, which other personal property, the court found was the household goods. A will was made "in performance of the agreement," but three days before the death of Moreau, through the influence of parties "entirely friendly to the son's interest," a new will was made by which he devised to Mrs. Berg, the *use* of the homestead place for two years, the horse and buggy and the household goods, all of which was of the value of $335 to $375. Mrs. Berg brought suit for specific performance, but before the cause was finally determined she died testate, and the cause was revived in the name of her executor and sole devisee. The relief sought was granted, but it is pointed out that the value of the services rendered by Mrs. Berg could "not well be estimated in money." In the course of the opinion Judge Lamb said that "at the time the contract was made, Mr. Moreau's reasonable expectation of life was from 4.38 to 4.74 years, and he might have lived much longer. If he had lived out his time, the compensation agreed upon would have been no more than fair. And if he had lived longer, it would have been inadequate." John Selle, as stated above, was seventy-one years old at the time of his death and his expectancy was 8.65 years. Mortality tables were not introduced, but we judicially notice these tables. [Hohlstein v. St. Louis Roofing Co., 328 Mo. 899, 42 S. W. (2d) 573.] But, as stated, more than life expectancy and that the contract was fair when made is required for specific performance in cases like the present one.

In Lothrop v. Marble, supra, specific performance was granted on

an oral contract to convey land for services rendered to a helpless old man, who lived only about a month after the contract was made. The age of the promisor is not given. He had no relatives; was afflicted with chronic dyspepsia and asthma involving the lungs and "presented much to be dreaded by all who must remain in his presence and a most offensive odor pervaded the entire house;" he was "unable to help himself in any way and the work of caring for him was difficult and unpleasant." The court pointed out that it would be difficult to fix a money compensation for the services rendered. It also appears that no question was raised as to the adequacy of the consideration, nor was there any evidence as to the value of the property concerned or of the services rendered. It was also shown that Mrs. Lothrop, the promisee, paid the expenses incident to the care and attention she gave. In support of the holding the court cited Rhodes v. Rhodes (N. Y.), 3 Sandf. Ch. 279; Brinton v. Van Cott, 8 Utah, 480; Wall's Appeal, 111 Pa. St. 460; 56 Am. St. Rep. 288; Sharkey v. McDermott, 91 Mo. 647, 4 S. W. 107, 60 Am. Rep. 270; Sutton v. Hayden, 62 Mo. 101; Davison v. Davison, 13 N. J. Eq. 246; Twiss v. George, 33 Mich. 253; Kofka v. Rosicky, 41 Neb. 328, 43 Am. St. Rep. 685; Godine v. Kidd, 64 Hun, 585, 19 N. Y. Supp. 335; Korminsky v. Korminsky, 2 Misc. Rep. 138, 21 N. Y. Supp. 611; Fry on Specific Performance, 563; Story's Equity Jurisprudence, 759.

We do not deem it necessary to further prolong this opinion. Under the facts, plaintiff is not entitled to specific performance, but he should not be cast without reasonable compensation for the services he rendered. When a court of equity is rightfully possessed of a case, it will not relinquish jurisdiction "short of doing complete justice." Rockhill Tennis Club v. Volker, 331 Mo. 947, 56 S. W. (2d) 9, l. c. 20, and authorities there cited. Plaintiff did not offer any evidence as to the value of the services rendered. He stood on the contract, and it appears that he was not satisfied with the value of the services suggested by the administrator. The time for filing claim in the probate court has expired. The answer in a separate count asks for partition. We see no reason why all questions raised by the pleadings cannot be disposed of in this case, and to that end, the judgment awarding plaintiff specific performance should be reversed, and the cause remanded with directions to ascertain the reasonable value of the services rendered by plaintiff under the contract, unless agreed upon, and to make such amount as found, a lien upon the land described in the pleadings and to proceed in partition if such is desired by defendants. It is so ordered. *Ferguson* and *Hyde, CC.,* concur.

PER CURIAM:—The foregoing opinion by BRADLEY, C., is adopted as the opinion of the court. All the judges concur.